UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DAKWAN PATTERSON,

                 Petitioner,

-vs-

THE PEOPLE OF THE STATE OF NEW
YORK,

                 Respondent.

No. 6:20-cv-06286-CJS
DECISION AND ORDER

---

**APPEARANCES**

For Petitioner:

Mr. Dakwan Patterson, *Pro Se*
15-B-1603
Auburn Correctional Facility
Box 618
Auburn, New York 13021

For Respondent:

Paul B. Lyons and Matthew Keller,
*Assistant Attorney Generals of Counsel*
Attorney General of State of New York
28 Liberty Street
New York, New York 10005

**INTRODUCTION**

Dakwan Patterson ("Petitioner") has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF No. 1.  Petitioner is in Respondent's custody pursuant to a judgment entered against him in New York State Supreme Court, County of Monroe (DeMarco, J.), following a jury verdict convicting him of second-degree (intentional) murder (New York Penal Law ("P.L.") § 125.25(1)).  For the reasons below, the request for a writ of a habeas corpus is denied, and the petition is dismissed.

1

**BACKGROUND**

## I.  The Crime and Indictment

Shortly after noon on December 18, 2013, Antoine "Twizzie" Brown ("Brown") was fatally shot outside a convenience store at the corner of Jay and Orchard Streets.  Brown's friends, Lester "Heam" Anderson ("Anderson") and George "Peanut" McFadden ("McFadden"), witnessed the shooting, which also was captured on security camera.  By Monroe County indictment number 2014-0407, Petitioner was charged with one count of second-degree (intentional) murder in connection with the shooting.

## II.  The Trial

### A.  The Prosecution's Direct Case

Anderson[1] testified that just after noon on December 18, 2013, he was at the corner of Jay and Orchard Streets in the City of Rochester with McFadden and Brown.  TT: 416-17.[2]  They were standing in front of the convenience store on Jay Street.  A black Cadillac drove by, and Anderson saw that the driver was looking at them.  TT: 417.  The car returned about five minutes later and parked on Jay Street across from the convenience store.  TT: 420-21.  Petitioner got out and walked across Jay Street towards the store.  TT: 422.  Anderson testified that Petitioner engaged him, McFadden, and Brown in "general" conversation, "like what's going on and stuff, and I guess [Petitioner] and [Brown], they -- it extended from there."  TT: 422-23.

---

[1] Anderson and McFadden testified under material witness orders.  TT: 45-51, 319-24.

[2] Citations to "TT:" and "ST:" refer to pages of the trial transcript and sentencing transcript, respectively, filed by Respondent at ECF Nos. 10-3 and 10-4.  Citations to "SR: " refer to the Bates-stamped numbers at the bottom of the state court records filed electronically by Respondent at ECF No. 10-2.

Anderson testified that Petitioner asked, "what's popping?"  TT: 430.  Petitioner then said to Brown, "'[e]very time I see you[,]' or something, 'we got beef[,]' or something to that aspect [sic]."  TT: 430.  Anderson said that Brown replied, "'I don't know you.  Do we got beef[?]'"  TT: 431.  Petitioner said "something else" but Anderson was not paying attention because he did not think the conversation was anything important.  TT: 431.  Anderson did not hear Brown say to Petitioner, "Come back with everything you have got," at any point during the interaction.  TT: 431.

Anderson recalled that the conversation between Petitioner and Brown did not last very long.  Petitioner started walking away but turned back around before he got to his car.  Anderson testified that he heard Brown or McFadden say that Petitioner had a gun, so he started running away.  As he did so, he heard two shots.  TT: 423-24, 431-32.  When he did not see Brown following him and McFadden, Anderson ran back to the convenience store.  TT: 424-25.  There he saw Brown, lying on the floor of the store.  Brown said, "That dude shot me."  TT: 425.

McFadden testified that he was standing with Petitioner and Anderson at the corner of Jay and Orchard Streets outside the convenience store shortly after noon on December 18, 2013.  TT: 458-59.  McFadden had seen a black Cadillac with two occupants circling the area around the convenience store.  TT: 459-61.  McFadden testified that Brown commented, "'that's Q's mom's boyfriend's car.'"  TT: 459.  McFadden said that the car turned from Jay Street onto Orchard Street and drove by them slowly.  McFadden could see that the driver, a male, was looking at them.  TT: 461.  McFadden recalled Brown making a comment that Petitioner was "riding around with this mean mug and looking at people all hard."  TT: 462-63.

Shortly afterwards, McFadden saw the Cadilac pull up directly across from the store where they were standing.  TT: 463.  McFadden testified that Petitioner got out of the car and

was looking "directly at [Brown]" as he crossed the street.  TT: 464.  McFadden said that as Petitioner was reaching for the door to enter the convenience store, he said, "Why every time I ride around here you looking at me?"  TT: 464.  McFadden testified that Brown replied, "'You ride around here looking at us all day.'"  TT: 464.  Petitioner said, "'Yo, I don't like the way you be watching me' and stuff like that," and also asked, "'You got something on your mind?'"  TT: 465.  Brown replied "whatever," and he and Petitioner "kept exchang[ing] words."  TT: 465.

McFadden testified that as Petitioner started walking back to his car, he announced, "'I'll be right back.'"  TT: 465.  Brown replied, "'Yeah, I'll be right here.'"  TT: 465.  He also said, "You better bring everything you have got."  TT: 493-94.  McFadden testified that Petitioner turned back around, pulled out a black handgun, fired two rounds at Brown, returned to his car, and drove away "[l]ike casually, like regularly."  TT: 469-70, 474.

McFadden testified that as soon as he heard the gunshots, he and Anderson started running.  TT: 470.  When McFadden did not see Brown following behind them, he went back to the corner.  TT: 473-74.  He found Brown inside the store; Brown said to him, "I'm shot in the chest."  TT: 474.  McFadden applied pressure to Brown's chest wound to try to stop the bleeding.  TT: 475.

Davida Kennedy ("Kennedy") testified that she had known Anderson, McFadden, and Brown for many years.  Shortly after noon on December 18, 2013, Kennedy was driving through the area of Jay and Orchard Streets in the City of Rochester.  TT: 359-60.  Her friend Lucrecia Maddox ("Maddox") was in the passenger seat of the car.  As Kennedy turned left turn from Orchard Street onto Jay Street, she recognized Anderson, McFadden, and Brown standing on the corner near the convenience store.  TT: 360-61, 442-43.  Maddox also noticed that there was a man standing in the center of Jay Street with a gun in his hand.  TT: 443.  Maddox testified

that the man looked as though he was about to get into a black Cadillac that was parked on Jay Street across from the store; the license plate on the Cadillac ended in 7121.  TT: 443, 444-46.

As Kennedy turned onto Jay Street, Maddox commented, "'Oh, he has a big ass gun,'" referring to the man standing in the middle of Jay Street.  TT: 362.  Kennedy looked back towards the corner of Jay and Orchard Streets and heard two gun shots.  TT: 362, 444.  Maddox also heard the gunshots and saw the man in the street shooting at one of the men standing on the corner; after being shot, the man fell backwards against the convenience store.  TT: 443-44.

Kennedy then turned her car around in a church parking and drove back to the store, where McFadden and Anderson put Brown in the back seat.  TT: 367.  Kennedy, Maddox, and Anderson rushed Brown to St. Mary's Hospital.  TT: 367-68, 449-50.  Brown sustained gunshot wounds to his right chest wall and left thigh; he died as a result of multiple gunshot wounds.  TT: 678.

Rochester Police Department ("RPD") Investigator Seth Carr ("Carr") retrieved the video footage from the city-operated security camera located at the corner of Jay and Orchard Streets and reviewed it.[3]  TT: 588-90.  After talking with McFadden and Maddox, Carr traveled to New York City with several other RPD investigators on March 31, 2014.  TT: 600-01.  They had with them search warrants for Petitioner's apartment in Brooklyn and a 2001 Cadillac with license plate number GHS 7121, as well as an arrest warrant for Petitioner.  TT: 601.  With the assistance of other law enforcement agencies in New York City, Petitioner was arrested later that morning.  TT: 601.

### B.  The Defense Case

---

[3] The prosecution introduced compact discs of the security camera video footage as People's Exhibits 1 and 137. The video footage has no sound and depicts the events from several different vantage points.  The video footage was played for the jury.  TT: 589-90.  Respondent has filed a copy of People's Exhibit 137 with the Court in connection with his response to the petition.

Petitioner testified that on December 18, 2013, he arrived in Rochester at about 5 a.m. to visit his girlfriend, Kelle Grice ("Grice").  TT: 691.  Around noon that day, Petitioner and Grice were in his Cadillac running errands in the area of Jay and Orchard Streets.  They tried to visit Grice's godson's mother, who lived in the area, but she was not at home.  Petitioner then decided to go to the convenience store at the corner of Jay and Orchard Streets to buy some cigarettes. TT: 692-93.  He said that he had never been to that store.  When he parked across the street, there were three men he did not know standing on the corner; they started walking towards him as though they were going to meet him at the door to the convenience store.  TT: 693.  Petitioner said to them, "'What's going on, fellows?'"  TT: 693.  Brown replied, "'Fuck you mean what's going on?  Fuck you always coming around here staring at me.  Every time you come — you're still looking at me funny every time you come around here.'"  TT: 693.

By that point, Petitioner had reached the store entrance.  He said, "'How do you know what I'm looking at when my car got tints on it?'"  TT: 693.  Brown responded, "'You know what I'm talking about.  You know what time it is.'"  TT: 693.  Petitioner responded, "'I don't know you. I don't even [sic] you, like, what you talking about?'"  TT: 693-94.  Petitioner noticed that Brown took one hand out of his pocket and kept the other hand in his pocket.  TT: 694.  Petitioner testified that as Brown was "saying, 'You know what time it is.  You know what time it is,'" he "shows me like — he shows me a pistol in his pocket . . . He like took it halfway out of his pocket." TT: 695.  Petitioner believed that Brown was trying to rob him.  TT: 694.  Petitioner said, "'You're not getting anything,'" and "just turned around" and "walked away."  TT: 695.

Petitioner testified, "As I'm walking towards my car, [Brown]'s saying, 'Where the fuck you going?  You think this a game?  I'm going to shoot you ass.  You keep on walking.'"  TT: 695. Petitioner then "turned around and fired two shots."  TT: 695.  When asked why he fired the two

shots, Petitioner testified, "As I was walking away from him, I'm saying in my mind, I hope this dude don't shoot me in my back, because like I don't — I don't know him or anything like — I just — I was scared that he was going to shoot.  I was scared he was going to shoot me."  TT: 695-96.  Petitioner said he did not intend to kill Brown but "[j]ust to get away from the situation."  TT: 696, 698.

Petitioner got into his car and drove away.  TT: 696.  He dropped Grice off at her house and drove back to Brooklyn.  TT: 696.  He did not contact the police because he was scared of getting locked up; he also feared retribution from "the people that was in the area" of the shooting.  TT: 696-97.

### C.  The Charge Conference

After the proofs were closed, the trial court conducted the charge conference in chambers, off the record.  TT: 777-78.  The following morning, the trial court placed on the record that, during the charge conference, the prosecutor did not object to defense counsel's request to have the jury instructed on justification based on the use of deadly physical force against a person who is using or about to use deadly physical force, P.L. § 35.15(2)(a).[4]  TT: 778.  Defense counsel indicated that the trial court had denied his additional request for a justification instruction based on the use of deadly physical force to prevent the commission of a robbery, P.L. § 35.15(2)(b).  TT: 778.  The prosecutor confirmed that she did not object to the jury being instructed on the lesser included offense of first-degree manslaughter, P.L. § 125.20(1).  TT: 778-79.

---

[4] Under P.L. § 35.15(2)(a), "[a] person may not use deadly physical force upon another person under circumstances specified in [P.L. § 35.15] subdivision one unless: . . . [t]he actor reasonably believes that such other person is using or about to use deadly physical force."  N.Y. Penal Law § 35.15(2)(a).  "Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating; except that the actor is under no duty to retreat [in circumstances not relevant here]."  *Id.*

**D. The Verdict and Sentence**

The trial court instructed the jury on justification under P.L. § 35.15(2)(a).  TT: 847-51.  It also instructed the jury on the lesser included offense of first-degree manslaughter.  TT: 852-53. The jury returned a verdict convicting Petitioner of second-degree murder as charged in the indictment.  TT: 888.  He was sentenced on May 13, 2015, to an indeterminate term of incarceration of twenty-five years to life.  ST: 19.

**III.    Post-Judgment Proceedings in State Court**

Represented by new counsel, Petitioner appealed his conviction to the Appellate Division, of New York State Supreme Court ("Appellate Division").  Petitioner asserted that the trial court's refusal to instruct the jury on justification under P.L. § 35.15(2)(b) not only violated state law but also deprived him of his "[s]tate and [f]ederal constitutional rights to due process, to present a complete defense and to have a fair trial."  SR: 13.  On October 4, 2019, the Appellate Division rejected the jury instruction claim on the merits and unanimously affirmed the conviction.  *People v. Patterson*, 176 A.D.3d 1637 (4th Dep't 2019).  The New York Court of Appeals denied leave to appeal on December 31, 2019.  *People v. Patterson*, 34 N.Y.3d 1080 (2019).

Petitioner apparently also filed a petition for a writ of error *coram nobis* which was denied. *People v. Patterson*, 187 A.D.3d 1604 (4th Dep't), *leave denied*, 36 N.Y.3d 975 (2020).

**V.    Federal Habeas Proceeding**

In his timely habeas petition, ECF No. 1, Petitioner reasserts the jury instruction claim raised on direct appeal.  Respondent filed a response, ECF No. 10; the state court records and trial transcripts, ECF Nos. 10-1 through 10-4; and a memorandum of law in opposition, ECF No. 9.  Petitioner did not file a reply.  He filed a motion to stay and a motion to amend the petition,

ECF Nos. 11, 13, which Respondent opposed, ECF No. 12.  The Court denied both motions. ECF No. 14.

## DISCUSSION

### I.    28 U.S.C. § 2254(d)'s Limitations on Habeas Relief

Because the Appellate Division adjudicated Petitioner's jury instruction claim on the merits, this Court's review is constrained by the limitations on habeas relief in 28 U.S.C. § 2254(d).  *See Harrington v. Richter*, 562 U.S. 86, 98 (2011) ("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2).").  Section 2254(d) articulates a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (citation and internal quotation marks omitted).

Under 28 U.S.C. § 2254(d), a federal court "shall not . . . grant[ ]" an application for a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.*, § 2254(d).  In addition, a state court's factual findings are entitled to a presumption of correctness which only may be rebutted by "clear and convincing evidence."  *Id.*, § 2254(e)(1).

The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question."  *Brisco v. Ercole*, 565

F.3d 80, 89 (2d Cir. 2009).  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations" inasmuch as the application of a general standard to a specific case "can demand a substantial element of judgment."  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *see also Brisco*, 565 F.3d at 90 (noting that a state court applying a "fact-dependent standard . . . to the facts of a specific case is . . . entitled to significant 'leeway' when [a habeas court] review[s] its decision for reasonableness") (quoting *Yarborough*, 541 U.S. at 664).

## II.    Relevant Legal Principles

At the outset, the Court notes that "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  "Where an error in a jury instruction is alleged, 'it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.'"  *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).  "The question is not whether the trial court gave a faulty instruction, but rather 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Id.* (quoting *Cupp*, 414 U.S. at 147).

When reviewing a habeas petition asserting a claim arising from a state court's refusal to give a requested justification charge, a habeas court must resolve the following three questions: "First, was [the defendant] entitled to a justification charge?  Second, if so, did the failure to give one result in a denial of due process?  Third, if so, did the state court's contrary conclusion

constitute an unreasonable application of clear Supreme Court law?"  *Jackson v. Edwards*, 404

F.3d 612, 621 (2d Cir. 2005); *see also*, *e.g.*, *Davis*, 270 F.3d at 124 (same).

III.    **Application**

A.    **A Justification Charge Under P.L. § 35.15(2)(b) Was Not Required as a Matter of New York State Law**

"In determining whether the evidence in a particular case warrants the giving of a

justification charge, New York courts repeatedly have emphasized that the evidence is to be

construed in the light most favorable to the defendant."  *Blazic v. Henderson*, 900 F.2d 534, 540

(2d Cir. 1990).  Accordingly, "there must exist a reasonable view of the evidence from which a

jury could conclude that the defendant's acts were justified."  *Id.*  However, "[the trial] court is not

required to adopt an artificial or irrational view of the evidence in deciding whether a justification

charge is warranted."  *Id.* (citing *People v. Butts*, 72 N.Y.2d 746, 750 (1988)).  "[D]ue process

does not require the giving of a jury instruction when such charge is not supported by the

evidence."  *Id.* at 541 (citing *Hooper v. Evans*, 456 U.S. 605, 611 (1982)).

P.L. § 35.15(2)(b) provides that "[a] person may not use deadly physical force upon

another person under circumstances specified in [P.L. § 35.15] subdivision one unless: . . . [h]e

or she reasonably believes that such other person is committing or attempting to commit a

kidnapping, forcible rape, forcible criminal sexual act[,] or robbery. . . ."  N.Y. Penal Law §

35.15(2)(b) (McKinney).  "Robbery is forcible stealing."  N.Y. Penal Law. § 160.00.  According to

P.L. § 160.00,

> [a] person forcibly steals property and commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of:
>
> > 1. Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or

11

    2. Compelling the owner of such property or another person to deliver
      up the property or to engage in other conduct which aids in the
      commission of the larceny.

N.Y. Penal Law § 160.00 (McKinney).   "Thus, a court confronted with a request to charge justification in defense of a robbery must first determine whether there is a reasonable view of the evidence that 'the defendant had the requisite beliefs under section 35.15[(2)(b)], that is, whether he believed deadly force was necessary to avert the . . . commission of one of the felonies enumerated therein[, and] whether . . . , in light of all the "circumstances", . . . a reasonable person could have had these beliefs.'"  *Patterson*, 176 A.D.3d at 1638-39 (alteration and ellipses in original) (quotation omitted).

      The Appellate Division summarized the trial evidence as follows:

> the victim and two other men were standing outside of the store, and the victim said something to defendant as he opened the door to the store.  After a brief conversation with the victim, defendant then walked away from the store, crossing the sidewalk and the lane of traffic nearest the store, while the victim and the two men with him did not move.  After crossing the center line of the street, however, defendant removed a handgun from his pocket, reversed course, returned to the sidewalk near the storefront, and shot the victim two times.  The victim had one empty hand visible and the other remained in his pocket until after the shooting. Defendant testified that he believed that the victim was going to rob him, based on defendant's testimony that the victim said "[y]ou know what time it is" to defendant during their discussion.  In addition, a prosecution witness[, McFadden,] testified that the victim said to defendant, as defendant initially walked away, "[w]hen you come back, bring everything you have."  Defendant testified that he interpreted those statements as meaning that the victim was about to rob him.

*Id.* at 1637-38 (first and third alterations in original).  The Appellate Division determined that based on the foregoing proof, a reasonable person could not have believed that Brown was "committing or attempting to commit a . . . robbery," P.L. § 35.15(2)(b), at the time Petitioner fired his weapon.  *Patterson*, 176 A.D.3d at 1639.  The Appellate Division noted that:

> the two statements on which defendant relies are equivocal inasmuch as both could be interpreted as either that the victim said he was going to rob defendant, or that the victim threatened to shoot defendant for disrespecting him if he returned

> to the victim's location.  More importantly, regardless of whether defendant's belief would have been reasonable at an earlier point in time, and "[e]ven if defendant's trial testimony establishes that he actually believed that the victim was [preparing to rob] him with a weapon . . . , there is no reasonable view of the evidence that 'a reasonable person in . . . defendant's circumstances would have believed' the victim to [be committing or attempting to commit a robbery at the time of the shooting].  Put simply, the surveillance footage reflects that defendant's [shooting] of the victim with the [handgun] cannot be considered" to have been to prevent a robbery.

*Id.* (alterations and ellipses in original) (quoting *People v. Sparks*, 29 N.Y.3d 932, 935 (2017)).

This Court has reviewed the trial transcript and watched the security camera footage, *see* People's Exhibit 137, and concludes that the Appellate Division's determination of the facts was reasonable in light of the evidence presented at trial, *see* 28 U.S.C. § 2254(d)(2).[5]  Furthermore, Petitioner has not rebutted the presumption of correctness, *id.* § 2254(e)(1), owed to the Appellate Division's factual findings.

The video footage begins with Brown, McFadden, and Anderson standing outside of the convenience store.  *See* People's Exhibit 137 ("Ex. 137"), 0:00 to 1:52.  The camera angle then switches to a view down Jay Street.  A black vehicle travels towards the intersection at Orchard Street, stops, and parks across the street from the store.  *Id.*, 1:53 to 2:20.  Petitioner is seen exiting the vehicle and walking across Jay Street toward the store.  *Id.*, 2:21 to 2:28.

At 2:29 in the video, Petitioner stops with his left hand on the store entrance, facing the three men on the corner; he is speaking with someone.  At 2:35, Brown enters the frame, and he and Petitioner continue speaking.  Both of Brown's hands are in his pockets.  Petitioner still has his hand on the door to the store; his right hand is in his pocket.  From 2:41 to 2:45, Petitioner

---

[5] As Respondent notes in his memorandum of law, People's Exhibit 137 is a compilation of video footage from several security cameras presented one after another in a series.  ECF No. 9 at 3 n.4.  The video from each camera contains a timestamp at the bottom of the screen.  *Id.*  Because the timestamps from the various cameras overlap, Respondent has cited to the time within the entire 27-minute and 40-second video file in People's Exhibit 137.  *Id.*  For instance, "1:50" refers to the one-minute, fifty-second mark.  That is the convention the Court has followed here.

gestures with his left hand; he appears to be pointing his index finger at Brown and then at himself.

At 2:46, Brown walks closer to Petitioner, who takes a step back, stops gesturing, and puts his left hand into his pocket.  Petitioner and Brown continue talking and at 2:50, Petitioner turns away and begins crossing the street.  *Id.*, 2:51 to: 2:54.

At 2:55, when Petitioner is one footstep from the center yellow line, he pulls a gun out of his right pocket, turns his head to the left, stops, and walks back across Jay Street toward the store.  *Id.*, 2:56 to 2:59.

At 3:00, when Petitioner is one footstep away from the sidewalk, he holds the gun at chest-height and points it at Brown, who is standing on the sidewalk about ten to twelve feet away.  Petitioner steps up onto the sidewalk and fires the gun at Brown.  *Id.*, 3:01 to 3:02.  Brown is spun around and falls against the façade of the store.  *Id.*, 3:03.  He then staggers to the door, opens it, and enters the store.  *Id.*, 3:04 to 3:16.  Meanwhile, Petitioner turns around and walks back across the street, gets into his car, and slowly drives away.  *Id.*, 3:03 to 3:15.

The video footage substantiates the Appellate Division's finding that there is simply no reasonable view of the evidence under which a reasonable person in Petitioner's circumstances could have believed that Brown was committing or attempting to commit a robbery at the time Petitioner fired his gun.  Moreover, Petitioner's own testimony makes clear that he did not use deadly force at the moment during the interaction when Brown allegedly attempted to rob him.  Instead, as the following excerpt from Petitioner's testimony on direct examination demonstrates, he only fired at Brown *after* Brown allegedly threatened to "shoot [his] ass":

Q.    You say he showed you a pistol in his pocket.  What happened?
A.    He like took it halfway out of his pocket.
Q.    The pistol?
A.    Yes.

14

Q.      And you saw that?
A.      Yes.
Q.      What happened at that time?
A.      I walked away. I started walking towards my car.  As I'm walking towards my car, he's saying, "Where the fuck you going?  You think this a game?  I'm going to shoot you ass.  You keep on walking."
Q.      What did you do then?
A.      I turned around and fired two shots.
Q.      Why did you fire the two shots, Dakwan?
A.      As I was walking away from him, I'm saying in my mind, I hope this dude don't shoot me in my back. . . .

TT: 695.

Thus, by the time Brown issued his alleged threat, any robbery or attempted robbery had already ended.   Because there was no reasonable view of the evidence that Brown was committing or attempting to commit a robbery at the time Petitioner fired at him, the trial court did not err as a matter of New York state law in declining to instruct the jury to consider whether Petitioner was justified in P.L. § 35.15(2)(b) in using deadly physical force to prevent Brown from committing or attempting to commit a robbery.

**B.      The Failure to Give a Justification Charge Under P.L. § 35.15(2)(b) Did Not Violate Due Process**

Even if the Appellate Division erred in finding that a charge under P.L. § 35.15(2)(b) was not required as a matter of New York state law, no violation of Petitioner's due process rights occurred.  The Second Circuit has found that the failure to give a justification charge "so infected the entire trial that the resulting conviction violate[d] due process," *Cupp,* 414 U.S. at 147, where "[t]he effects of the [state] court's error were to deprive [the petitioner] entirely of his defense— on which he had a significant possibility of prevailing—and to insure his conviction."  *Davis*, 270 F.3d at 132.  Conversely, the Second Circuit has "declined to find a violation of due process where a justification charge would not have affected the jury's verdict."  *Gibbs v. Donnelly*, 402 F. App'x 566, 568 (2d Cir. 2010) (citing *Blazic*, 900 F.2d at 542-43 (panel rejected the petitioner's

contention that the omission of a justification charge "so infected the entire trial that the resulting conviction violate[d] due process" because it "perceive[d] no basis to conclude that a jury would have responded differently had the charge been given")).

Here, both self-defense theories were premised on Brown's alleged threat to "shoot [Petitioner's] ass." TT: 695.  This is confirmed by appellate counsel's leave application, in which he argued that the Appellate Division erroneously ignored his testimony about Brown's threat to "shoot [his] ass" when concluding that a charge under P.L. § 35.15(2)(b) was not required:

> While Mr. Patterson did interpret the victim's first statement ("You know what time it is") as a robbery attempt, he disputed that the victim ever said "[w]hen you come back, bring everything you have."  Instead, Mr. Patterson testified that, as he walked toward his car to avoid the confrontation, the would-be robber yelled:
>
> > *"Where the fuck you going?  You think this is a game?  I'm going to shoot you[r] ass.  You keep on walking."*
>
> *In sum, the Appellate Division rejected Mr. Patterson's appellate argument about the reasonableness of his action by ignoring the above-quoted statements, put into evidence by the defendant's testimony, and by substituting a different, expressly-disputed statement, put into evidence by testimony from a prosecution witness ("[w]hen you come back, bring everything you have").*[6]  Such analysis certainly was not reviewing the record in the light most favorable to Mr. Patterson.

SR: 80 (emphasis supplied); *see also* SR: 81 (arguing that the Appellate Division's incorrect reliance on the statement about "bring[ing] everything you have," and its failure to mention the statement about "shoot[ing] you [sic] ass" "improperly undermined Mr. Patterson's actual contention at trial that the shooting was motivated by his fear of an on-going robbery attempt rather than by a feeling of being disrespected (prosecutor's argument").

As both justification defenses relied on the precisely same evidence, the "deadly force to prevent a robbery" theory under P.L. § 35.15(2)(b) was no broader than the "deadly force to

---

[6] Appellate counsel ignored the fact that defense counsel pressed McFadden on whether this statement was made. Eventually, defense counsel elicited an admission from McFadden that he previously had told the police that Brown said, "[w]hen you come back, bring everything you have."  TT: 493-94.

prevent the use of deadly force" theory under P.L. § 35.15(2)(a).  The jury, however, considered and rejected the applicability of P.L. § 35.15(2)(a).  In this particular case, there is no distinction between the two defenses that could have made a conceivable difference to the jury's deliberations.  Because Petitioner has not established any basis to conclude that the jury "would have responded differently had the charge been given," *Blazic*, 900 F.2d at 543, the Court cannot conclude that "the omission of [the requested] justification charge 'so infected the entire trial that the resulting conviction violate[d] due process.'"  *Id.* (quoting *Cupp*, 414 U.S. at 147); *see also Henderson v. Kibbe*, 431 U.S. 145, 156-57 (1977) (denying habeas relief when the possibility "that the jury might have reached a different verdict pursuant to an additional instruction" was "too speculative to justify the conclusion that constitutional error was committed").

### C.   The Appellate Division's Decision Was Not Contrary to, or an Unreasonable Application of Clearly Established Supreme Court Precedent

Since the Court answered the previous two questions in Respondent's favor, it need not reach the question of whether the Appellate Division ruled in a manner contrary to, or unreasonably applied, clearly established federal law as determined by the Supreme Court's holdings.  *See*, *e.g.*, *Blazic*, 900 F.2d at 543 (panel ended its analysis after concluding that, although "New York law warranted a justification charge in this case," it "perceive[d] no basis to conclude that a jury would have responded differently had the charge been given" and "[t]hus, on the facts of this case, [it] reject[ed] the contention that the omission of a justification charge 'so infected the entire trial that the resulting conviction violate[d] due process'" (quoting *Cupp*, 414 U.S. at 147).

In any event, Petitioner has not fulfilled either of the limitations on relief specified in § 2254(d)(1).  The Supreme Court has observed that its cases following *Cupp* "establish that [while] [s]tates must prove guilt beyond a reasonable doubt with respect to every element of the

17

offense charged, . . . they may place on defendants the burden of proving affirmative defenses."
*Gilmore v. Taylor*, 508 U.S. 333, 341 (1993).  Although "the Constitution guarantees criminal
defendants 'a meaningful opportunity to present a complete defense[,]'" *Crane v. Kentucky*, 476
U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)), "[n]o 'specific
legal rule' has been 'squarely established' that determines when—if ever—the Constitution
guarantees state defendants the right to a self-defense instruction."  *Porter v. Eppinger*, No. 19-
3443, 2021 WL 3828113, at *6 (6th Cir. Aug. 27, 2021) (quoting *Knowles v. Mirzayance*, 556
U.S. 111, 122 (2009); citing *Keahey v. Marquis*, 978 F.3d 474, 479 (6th Cir. 2020)).

In the context of a retroactivity analysis, the Supreme Court has stated that "none" of its
cases following *Crane* "involved restrictions on a defendant's ability to present an affirmative
defense." *Gilmore*, 508 U.S. at 343; *see also id.* at 344 (rejecting the argument that "the right to
present a defense includes the right to have the jury consider it" because "such an expansive
reading of our cases would make a nullity of the rule . . . that instructional errors of state law
generally may not form the basis for federal habeas relief").  Thus, the Appellate Division's
rejection of the jury charge claim thus cannot have been "contrary to" clearly established
Supreme Court precedent.

Nor was it an unreasonable application of the Supreme Court's precedents.  "In order to
hold that a state court's adjudication constituted 'an unreasonable application of' a Supreme
Court holding, a federal court must find more than just 'that the relevant state-court decision
applied clearly established federal law erroneously or incorrectly,'" *Fuentes v. T. Griffin*, 829 F.3d
233, 245 (2d Cir. 2016) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)).  "Because the
*Cupp* standard is a general one, 'a state court has even more latitude to reasonably determine

that a defendant has not satisfied that standard.'"  *Smith v. Artus*, 610 F. App'x 23, 27 (2d Cir. 2015) (quoting *Knowles*, 556 U.S. at 123).

As discussed above, a charge under P.L. § 35.15(2)(b) would not have resulted in Petitioner's acquittal and thus he did not demonstrate a violation of his due process rights to a fair trial or to present a defense.  Because the Appellate Division's decision reflected a correct application of the due process standards articulated in *Cupp*, it cannot have been "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 103.  Therefore, Petitioner has not satisfied the "unreasonable application" prong of § 2254(d)(1).

## CONCLUSION

For the foregoing reasons, the request for a writ of habeas corpus is denied, and the petition, ECF No. 1, is dismissed.  Because Petitioner has failed to make a substantial showing of the denial of a constitutional right, *see* 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  The Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

HON. CHARLES J. SIRAGUSA
United States District Judge

Dated:        January 8, 2024
              Rochester, New York.

19